**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

TERESA M. GARNER, as guardian ad
litem for Melissa Marie Walden, an
infant,
Plaintiff-Appellant,

v.

DONALD D. HOWE, M.D.; GASTONIA
WOMEN'S CENTER, P.A.; ASHLEY
WOMEN'S CENTER, P.A.,                                          No. 95-2492
Defendants-Appellees,

and

GASTON MEMORIAL HOSPITAL HOME
HEALTH SERVICES, INCORPORATED,
Gaston Memorial Hospital,
Incorporated,
Defendant.

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert D. Potter, Senior District Judge.
(CA-93-228-3-P)

Argued: December 5, 1996

Decided: January 13, 1997

Before MURNAGHAN, WILLIAMS, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Adam Stein, FERGUSON, STEIN, WALLAS, ADKINS & GRESHAM, P.A., Chapel Hill, North Carolina, for Appellant. John Gardner Golding, GOLDING, MEEKINS, HOLDEN, COSPER & STILES, L.L.P., Charlotte, North Carolina, for Appellees. **ON BRIEF:** Ann Hubbard, FERGUSON, STEIN, WALLAS, ADKINS & GRESHAM, P.A., Chapel Hill, North Carolina; Stuart Z. Grossman, GROSSMAN & ROTH, Miami, Florida; Don Keenan, THE KEENAN LAW FIRM, Atlanta, Georgia, for Appellant. Elaine C. Miller, GOLDING, MEEKINS, HOLDEN, COSPER & STILES, L.L.P., Charlotte, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Melissa Garner was born a spastic paraplegic and suffers from cerebral palsy and seizures.[1] Teresa Garner, Melissa's mother and guardian ad litem, sued Appellees Dr. Howe (the attending physician) and the Gastonia Women's Center, P.A., alleging that Dr. Howe negligently provided medical care during Garner's labor and delivery of Melissa and that Dr. Howe's negligence proximately caused Melissa's severe, permanent brain damage. After a two-week trial, the jury returned a verdict in favor of Dr. Howe.

Garner seeks appellate review of the district court's evidentiary rulings with respect to post-1981 medical articles. Specifically, Garner contends that the district court prohibited Garner's experts from dis-

_____

[1] Since her birth, Melissa has not been able to walk, sit up by herself, roll over, speak, control her bladder or bowels, or control the movement of her hands.

2

cussing certain post-1981 articles, while allowing Dr. Howe's experts free rein to discuss the same post-1981 articles.

I.

FACTS AND PROCEDURAL HISTORY

Melissa was born on September 29, 1981 at the Gaston Memorial Hospital. On September 28, 1981, Garner reported to the Gastonia Women's Clinic for a checkup. At that time, Garner reported to Dr. Jacobs that she had not felt any fetal movement for approximately 24-36 hours. As a result, Dr. Jacobs asked Garner to return the next day for a non-stress test.[2] While the results of Garner's non-stress test were "non-reactive," due to Garner's impending due date, Dr. Jacobs sent Garner to Gaston Memorial Hospital[3] for further testing and possible induction of labor.

Upon her arrival at the hospital, Garner was prepared for an oxytocin challenge test (OCT).[4] The results of the OCT were "equivocal" according to Dr. Howe, but he acknowledged that the fetal monitor strip showed late decelerations. Given her due date, Dr. Howe decided to induce labor by giving Garner additional Pitocin to cause her contractions to continue and deliver the fetus.

In the meantime, Garner left the labor and delivery room to marry her boyfriend, the baby's father, in the hospital's chapel. When Gar-

_____

[2] A "non-stress test" measures the fetus's heart rate when the fetus moves.

[3] Gaston Memorial Hospital was named in the complaint, but reached a settlement with Melissa.

[4] In the oxytocin challenge test, the mother is hooked up to a fetal heart monitor and given oxytocin, or more commonly Pitocin, a synthetic form of oxytocin, a drug which induces contractions. The test aims to see how the fetus's heart rate responds to the "stress" of the contractions. The doctor reviewing the test looks for decelerations of the fetal heart rate before, during or after each contraction. A significant drop in the fetus's heart rate after a contraction is called a "late deceleration." If two or more late decelerations exist after at least half the contractions, the test is considered positive, or "non-reassuring."

ner returned, the nurses reconnected her to the fetal heart monitor, and Dr. Howe rechecked the strip. Again, he concluded the results were "equivocal." Thereafter, Dr. Howe turned off the Pitocin and cross-matched Garner for blood in the event that a Caesarean section was necessary.

After Garner was allowed to use the restroom, the fetal monitor was reattached and showed that Garner was in active labor, and therefore, no induction of labor was necessary. At 7:40 p.m., more than four hours after the original OCT, Dr. Howe ruptured Garner's membranes and attached an internal monitor to the fetus's scalp to get a more accurate reading of the fetus's heart rate. At 8:40 p.m., Melissa was born with the umbilical cord wrapped around her neck twice. Melissa was "cyanotic" or blue in color, with"very floppy" muscle tone. Melissa did not cry. In his labor and delivery note, Dr. Howe diagnosed a delivery "complicated by fetal distress."

Thereafter, Garner filed the instant action in the United States District Court for the Western District of North Carolina based upon diversity of citizenship jurisdiction. The case proceeded to trial, and after hearing two weeks of testimony and viewing over 100 exhibits, the jury returned a verdict in favor of Dr. Howe. Garner now appeals.

II.

DISCUSSION

The gravamen of Garner's appeal is that the district court applied a double standard in its evidentiary rulings with respect to certain post-1981 medical articles. Specifically, Garner's appeal focuses on two articles written by Dr. Barry Schifrin and Dr. Jeffrey Phelan [hereinafter Schifrin and Phelan articles]. [5] Both the Schifrin and Phelan articles suggested that Garner's clinical findings, the non-reactive non-stress test, the equivocal OCT, and the fetal monitor strips show-

_____

[5] Dr. Schifrin's article is entitled "Fetal Heart Rate Patterns and the Timing of Fetal Injury" and appears in the 1994 Journal of Perinatology. Dr. Phelan's article is entitled "Perinatal Observations in 48 Neurologically Impaired Term Infants" and was published in the American Journal of Obstetrics and Gynecology in August 1994.

4

ing intermittent late decelerations indicated a fetus already suffering from chronic brain damage, not acute brain damage occurring during labor and delivery.

Garner argues that during the presentation of her case the district court excluded any testimony about articles published after 1981, first on a case-by-case basis, and then by a blanket instruction. In reliance on the ruling, Garner argues that she refrained from examining her experts or Dr. Howe about the weaknesses and inconsistencies in recent medical literature. Garner maintains she is entitled to a new trial because the district court's inconsistent rulings deprived Garner of a fair opportunity to present her case and likely prejudiced the outcome of the case.

On the other hand, Dr. Howe argues that the district court's rulings were not inconsistent. Moreover, Dr. Howe argues that even if the district court's rulings were in error, Garner invited the error. Furthermore, Dr. Howe contends that Garner never made any proffer regarding evidence she now claims could have been offered. Lastly, the post-1981 articles offered by Dr. Howe were cumulative on the issue of causation, and their admission was harmless error, if error at all.

A.

At trial, both parties offered expert testimony on the standard of care, causation, and damages. Garner called Dr. Howe as her first witness. On the second day of trial, Garner's attorney argued that Dr. Howe should not be allowed "any further comments about standards beyond 1981" when Dr. Howe's testimony appeared to be weaving in and out of the 1981 standards of care. Both parties agreed that the standard of care in 1981, the time of Melissa's birth, should control. Dr. Howe's attorney argued, however, that with regard to the question of causation, "even the most up-to-date knowledge is admissible" and that post-1981 information is relevant as to "whether the doctor harmed anything."

After listening to Garner's attorney argue against the admission of any post-1981 information, the court ruled that admission of post-1981 medical articles was "a close question. I cannot decide that except on each question asked. You object to it and I'll consider it at

5

that time." The court continued, "I'll have to decide each question as it comes up . . . ."

On cross-examination, the post-1981 medical articles issue again arose when Dr. Howe's attorney questioned Dr. Howe about the Schifrin and Phelan medical articles.[6] After Dr. Howe's attorney's proffered the articles,[7] the district court sustained Garner's objection because the articles were "too remote in time" and "not capable of cross examination by anyone." Thus, the articles were not used.[8]

After the testimony of Garner's standard of care experts, and just prior to the testimony of one of her causation experts, Garner's attorney asked for clarification of the court's prior ruling with respect to post-1981 articles.[9] In response the court stated that:

---

[6] The 1994 Schifrin article was marked as Exhibit 49, and the Phelan article marked as Exhibit 47. Dr. Howe's attorney also questioned Dr. Howe about two other Schifrin articles, "Perinatal Antecedents of Cerebral Palsy", published in June, 1988 (marked Exhibit 48) and another article published in Clinical Obstetrics and Gynecology, a small volume that is published annually (marked Exhibit 50).

[7] Dr. Howe's attorney argued that:

> The articles have statements in them. We urge the Court to reconsider, because we're trying to show is whether there is evidence of a prior injury demonstrated by the monitor strip findings. Not whether the doctor should have considered that in the standard of care. But this is strictly on the question of whether anything he did caused the injury to the child or whether the fetus was already damaged before labor, and the findings on the strip merely reflect the preexisting damage. So when they were written becomes irrelevant on that point. We don't offer them to prove what he should have done or what he shouldn't have done. We offer them as some proof that the injury preexisted the occasion when he delivered the [baby]. And on that subject, we feel like it would be prejudicial to our position to keep out that information. It doesn't bear on the standard of care. It bears on cause.

[8] The court also sua sponte cautioned Dr. Stephen Gordon, Garner's standard of care expert, to "[k]eep out of 1994" when Dr. Gordon attempted to refer to Schifrin's 1994 article.

[9] Garner's attorney was concerned that Dr. Howe's attorney might attempt to cross-examine Hermansen using more current medical literature.

6

> The question came up [when Garner's attorney] said that the defendant was using articles written since 1981. Articles, of course, can be picked off trees like lemons or something. And at that time, I told the defense that they would not be able to use these articles. Treatise[s] might be something different[,] like this fellow's book you have all been using, Williams [Obstetrics]. Of course, that is a treatise. That's another matter. I'm talking about articles written as to causes which were produced since 1981.

After an exchange with counsel, the court reiterated:

> [W]hen the expert has consulted numerous sources and uses that information together with his own professional knowledge and experience to arrive at [his] opinion, that opinion is regarded as evidence in his own right and not as hearsay and disguise. I think that come[s] under Rule 703. What he knows he can talk about, but what he's going to try to refer to as articles he has read and have him talking about these articles, then the plaintiff cannot cross examine on that. So the ruling is as I told you before, any treatise up until whatever time you've got, you can rely on that, but you cannot rely on articles which you pick out of the sky and whatever and come in here and say this article says so and so and I'm relying on that.

Garner's causation expert, Dr. Hermansen, testified without mentioning any post-1981 articles.

Garner's attorney raised the post-1981 medical articles issue again prior to showing the videotaped deposition testimony of her standard of care expert, Dr. Robert Knuppel. Garner's attorney objected to questions posed by Dr. Howe's attorney,[10] about the 1994 Schifrin article, and asked that those questions be edited from the tape before

_____

[10] During Dr. Knuppel's deposition, Garner's attorney continually objected to any questions with respect to causation because Dr. Knuppel was prepared to testify only as to the standard of care issue. Over Garner's attorney's objections, Dr. Howe's attorney questioned Dr. Knuppel about Schifrin's 1994 article.

the jury's viewing. The court overruled Garner's attorney's objection, reasoning that because Dr. Knuppel had relied upon the 1994 article in fashioning his opinion, the article was admissible under Rule 703.**11**

After the court's ruling, Garner's attorney asked the court why the 1994 article was being discussed, when the court had previously ruled that the article could not be used. The district judge's law clerk then explained to Garner's attorney that:

> The Judge's ruling as to causation was it could be permissible if it was relied upon in the expert's field. It may be the very same article, but they did not make the representation previously. Now they've shown it. Your witness said it. That's the difference.

Garner's attorney raised the post-1981 articles issue one last time after Dr. Howe presented the videotaped testimony of his expert, Dr. Gary Hankins. During his testimony, after being shown both the Schifrin and Phelan articles, and Williams Obstetrics, Dr. Hankins testified that "now a fair accumulation of literature" supported his contention that Melissa suffered no injuries during labor and delivery. Dr. Hankins went on to testify that Melissa's injuries did not "occur during labor or delivery." Dr. Hankins stated as a basis for his opinion that "[w]e have a [fetal monitor] tracing that is characteristic of a previous injury. The baby is coming in already injured." Dr. Hankins, as previously noted, relied upon the post-1981 articles,**12** as well as the ACOG Bulletin, published in 1992.**13**

_____

**11** Rule 703 provides that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible.

**12** Dr. Hankins testified that the Schifrin and Phelan articles and the Williams Obstetrics textbook were "reliable and good reference sources."

**13** Garner's attorney did not object to the 1992 ACOG bulletin.

8

On cross-examination, Garner's attorney questioned Dr. Hankins extensively about post-1981 articles cited in the ACOG bulletin, but did not cross-examine Dr. Hankins about the 1994 Schifrin and Phelan articles on fetal monitor tracings. After Dr. Hankins' testimony, Garner's attorney noted an objection to the 1994 Schifrin and Phelan articles mentioned by Dr. Hankins and stated that "I take it you've come back down and sort of reversed your prior ruling." Dr. Howe's attorney responded that he was not offering the articles into evidence because the rules did not allow their admission. Since Garner's only objection after Dr. Hankins' testimony was to the admission of the post-1981 articles referred to by Dr. Hankins, the district court stated that "[t]he articles are not going to be in evidence so I don't think you have much objection to that."

B.

The district court's evidentiary rulings are reviewed for abuse of discretion. <u>Sasaki v. Class</u>, 92 F.3d 232, 241 (4th Cir. 1996) (evidentiary errors reviewed for abuse of discretion). In a nutshell, when the post-1981 articles issue first arose, the court noted that the use of the articles was a close question, and would rule on a question-by-question basis. Up until the testimony of Dr. Knuppel, the court had consistently ruled that post-1981 articles could not be used. Contrary to Garner's protestations, however, the record adequately reflects that the district court never made a blanket ruling that no post-1981 articles could be used. This fact is supported by Garner's own use of post-1981 articles in cross-examining some of Dr. Howe's experts.[14] Rather, the court stated that it would rule on the admissibility of post-1981 articles on a case-by-case basis. While admittedly, the district court ruled in plaintiff's favor until Dr. Knuppel's testimony, that fact alone does not transform a case-by-case approach into a blanket exclusion, as Garner appears to argue.

_____

[14] Garner's attorney cross-examined Dr. Hankins with the Schifrin and Phelan articles and questioned another of Dr. Howe's experts, Dr. Salafia, about her opinions on post-1981 books and articles published by Dr. Fox, one of Garner's expert witnesses. Dr. Salafia testified that, based on her examination of the slides of Melissa's placental tissue, a subacute viral infection was most likely the cause of Melissa's brain damage. Garner's attorney did not cross-examine Dr. Salafia, however, on the 1994 Schifrin and Phelan articles.

9

Apparently, Garner's trial strategy focused on keeping out the 1994 Schifrin and Phelan articles, which were arguably most damaging to Garner's case. Garner could have offered articles to rebut the Schifrin and Phelan articles but failed to do so.**15**

Furthermore, Garner has not pointed to one instance in the record where the district court did not allow one of Garner's experts to express an opinion. Nor does the record support Garner's contention that different rules applied for the admission of evidence. The record does not reveal any instance in which the district court refused to allow Garner to offer any post-1981 medical literature or ask any questions about the post-1981 articles. Now Garner argues that the absence of any support for her evidentiary argument is because Garner was operating under the belief that the district court had ruled that no post-1981 medical articles would be allowed. As explained above, the record does not support Garner's contention.

Garner also claims that had she been aware that the district court was going to reverse its ruling, she would not have allowed her other causation experts to leave. Thus, Garner claims that after Dr. Hermansen testified without mentioning the Schifrin and Phelan articles, she lost the opportunity to have her final causation expert discredit the Schifrin and Phelan articles. Again, Garner's decision to release her experts before the close of the entire case, while understandable given the expense of retaining experts, is not a basis for a new trial.**16**

With respect to Dr. Knuppel's testimony, Garner's argument is a bit curious. Dr. Knuppel testified, via deposition, for Garner as her standard of care expert. Dr. Knuppel, unlike Dr. Hermansen, was

_____

**15** We do not speculate as to whether Garner's failure to offer articles in rebuttal to the Schifrin and Phelan articles was an inability to locate rebuttal articles or a strategic trial tactic.

**16** We are unsure as to how helpful Dr. Hermansen's testimony with respect to the fetal monitor strips, the focus of the Schifrin and Phelan articles, would have been given that Dr. Hermansen readily admitted on cross-examination that he was not an expert in reading fetal monitoring strips. He testified that "I'm very limited on the interpretation of fetal monitoring strips. I don't do that. I leave that to the obstetricians. I said that in 1990 and I'll say it today."

familiar with the reading and interpretation of fetal monitor strips. As such, Dr. Howe's attorney questioned Dr. Knuppel about the 1994 Schifrin article on fetal monitor strips. Garner's attorney objected to any questions about the 1994 article because Dr. Knuppel was Garner's standard of care expert, not her causation expert. Over objection the following exchange occurred:

> Dr. Howe's Attorney (reading from 1994 Schifrin article): "In spite of the limited number of formal studies, persistently absent variability," which is the major component of this tracing in this article, "has been identified in textbooks and reports as suggesting neurologic compromise separate from hypoxia." Would you agree with that statement?

> Dr. Knuppel: Yes, I would.

> Attorney: And in this particular case, we have identified, have we not, persistent absent variability on this particular tracing?

> Dr. Knuppel: Yes, we have.

Thus, Garner's own expert agreed with the Schifrin article. Garner's claimed basis for appeal is that she was not given an opportunity to rebut the Schifrin and Phelan articles. Yet, Dr. Knuppel, Garner's own expert, did precisely that, albeit not in the manner Garner would have preferred.[17]

For whatever reason, Garner failed to offer articles to contradict or rebut the Schifrin and Phelan articles. Contrary to Garner's arguments, Garner was not prevented by the district court from introducing, either by way of opinion testimony or articles, another view of

---

[17] Moreover, surely Garner is not arguing that the Schifrin and Phelan articles were a surprise to her. The record demonstrates that Garner was aware of the Schifrin article a month before trial, and the Phelan article, at least two weeks before trial. Thus, as indicated above, Garner certainly was aware that Dr. Howe intended to use the medical articles at trial. Garner's decision, or inability, effectively to rebut the conclusions contained in those articles is not a basis for a new trial.

the fetal monitor strips. We conclude that the district court did not abuse its discretion in making the contested evidentiary rulings. Accordingly, the judgment of the district court is affirmed.**18**

AFFIRMED

_____

**18** Because we conclude that the district court did not commit error in its evidentiary rulings, no need exists to discuss the harmless error, or invited error issues.

12